James J. Little (SBN 123373)
J.J. LITTLE & ASSOCIATES
Fisherman's Village
13763 Fiji Way, Suite EU-4
Marina del Rey, California 90292
Tel:   (310) 622-9527
Fax:   (310) 477-9527

Attorney for Plaintiff and Secured Creditor
James J. Little

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In Re:<br><br>AMBER HOTEL CORPORATION,<br><br>　　　　Reorganized Debtor.<br>_____<br>JAMES J. LITTLE,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>AMBER HOTEL CORPORATION,<br><br>　　　　Defendant.<br>_____ | Case No. SV 1:13-11804 AA<br><br>Chapter 11<br><br>Adv. No.<br><br>**COMPLAINT SEEKING TO REVOKE CONFIRMATION ORDER PURSUANT TO 11 U.S.C. § 1144 AND FED. R. BANKR. P. 7001(5), BECAUSE SUCH ORDER WAS PROCURED BY FRAUD**<br><br>(Hearing date to be set by summons) |

　　　　Plaintiff James J. Little (hereinafter, "Plaintiff" and/or "Little"), hereby files his adversary Complaint seeking to set aside the Order Confirming Debtor's Amended Plan of Reorganization as

1
**COMPLAINT**

procured by fraud by Amber Hotel Corporation (hereinafter, "Debtor" and/or "Amber Hotel"), and alleges as follows:

## INTRODUCTION

1.  The root of Plaintiff's Complaint is the commission of a fraud upon the Court by Debtor and Stephen Post (hereinafter, "Mr. Post"), the Debtor's principal shareholder, Chief Executive Officer and statutory insider under 11 U.S.C. § 101(31).

2.  Under governing Ninth Circuit law, fraud upon the court has two branches: (1) an attempt to subvert the integrity of the Court through an unconscionable scheme or plan designed to influence the Court improperly in its decision-making process and (2) a fraud committed by an officer of the Court that prevented the Court from performing in the usual manner its impartial task of adjudging cases that are presented for adjudication.  Establishment of either branch establishes that a fraud upon the Court has been committed.

3.  Fraud upon the Court, in turn, provides a basis for revoking an order of confirmation pursuant to 11 U.S.C. § 1144.

4.  The Order Confirming Debtor's Amended Plan of Reorganization (Dated December 26, 2013) (hereinafter, the "Confirmation Order"), (Case # 1:13-bk-11804-AA, Docket No. 257), should be revoked pursuant to 11 U.S.C. § 1144 because the Confirmation Order was procured by fraud on the part of Debtor and Mr. Post within the meaning of 11 U.S.C. § 1144.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334.

6.  This adversary proceeding constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (L).

7.  Venue properly lies in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

8.  Plaintiff has standing to bring the Complaint and prosecute this adversary proceeding, and qualifies as a party in interest within the meaning of 11 U.S.C. § 1144.

## PARTIES

9. Plaintiff James J. Little is, and at all times relevant hereto was, an individual residing in Los Angeles County, California and a creditor of the Debtor.

10. Upon information and belief, Debtor and Defendant Amber Hotel is a corporation organized under the laws of the State of California, with its principal place of business in Los Angeles County, California.

11. On March 17, 2013, Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. (Case # 1:13-bk-11804-AA, Docket No. 1).

## FACTUAL ALLEGATIONS

### Amber Hotel's Frivolous Lawsuit Against Plaintiff's Clients

12. In 2004, Amber Hotel, a corporate shell for Mr. Post's activities as a broker of hotel properties, filed a frivolous lawsuit in an effort to extort payment from Frank Martini, his brother Satanand Sharma, and several of their corporate entities (hereinafter collectively referred to as the "Martini parties") alleging fraud and breach of contract.

13. Amber Hotel and Mr. Post claimed that the Martini parties owed them $276,000 in brokerage commissions under a hotel listing agreement because Amber Hotel had allegedly produced a ready, willing and able buyer to purchase a hotel owned by the Martini parties and listed it for sale with Amber Hotel, but the Martini parties elected not to sell. Amber Hotel also sought punitive damages.

14. Mr. Post had approached the Martini parties with a proposal that they retain him to explore possible buyers for their hotel property, assuring them that the agreement would cost them nothing unless and until he found them a buyer.

15. The Martini parties interacted exclusively with Mr. Post in all their dealings with Amber Hotel and relied directly on Mr. Post's representations about the nature of the listing agreement.

16. The Martini parties contended that that Mr. Post had never obtained or identified a qualified buyer for their hotel property and that his claim to the contrary was a transparent fraud for

the sole purpose of extorting an unearned brokerage commission from the Martini parties on threat of excessive litigation costs.

17. Mr. Post at all times managed all aspects of Amber Hotel's litigation against the Martini parties, including all tactical decisions and settlement discussions.

18. The Martini parties retained Plaintiff Little to defend them against Mr. Post and the Amber Hotel lawsuit. Because the Martini parties could not afford to pay Plaintiff's standard hourly rate, Plaintiff agreed to defer collection of a portion of his fees. Critically, the real estate listing agreement between Amber Hotel—which was negotiated and signed by Stephen Post—and the Martini parties provided attorney's fees to the prevailing party in any litigation arising out of the agreement. The fee agreement between Plaintiff and the Martini parties provided that the deferred portion of the fees was secured by an attorney's lien in Plaintiff's favor, on any attorney's fees awarded to the Martini parties against Amber Hotel, under the fee-shifting provision of the parties' broker's listing agreement.

19. In 2007, after expending more than seven-hundred (700) hours of billable attorney time, Plaintiff secured multiple unanimous defense verdicts for the Martini parties with respect to each and every one of Amber Hotel's allegations. The frivolity of Amber Hotel's complaint was laid bare at trial where Amber Hotel was unable to produce any proof that Mr. Post ever had a ready, willing and able buyer for the Martini parties' hotel.

20. Subsequent to the jury trial, judgment was entered against Amber Hotel in favor of the Martini parties on December 3, 2007. The Court specifically reserved jurisdiction to make a further award of costs and attorney's fees, pursuant to a properly made motion therefor.

21. Amber Hotel appealed from the merits judgment.

22. While this appeal was pending, the Court awarded the Martini parties $152,700 in attorney's fees and $8,669.52 in costs. Amber Hotel did not appeal the fee award.

**Stephen Post's Gambit to Nullify Plaintiff's Attorney's Lien**

23. Mr. Post subsequently contacted the Martini parties directly and initiated settlement discussions without Plaintiff's knowledge and/or participation. In an egregious breach of his ethical obligation, Amber Hotel's attorney (at the time) participated in these discussions at the direction of

4
**COMPLAINT**

Mr. Post, all of which were conducted behind Plaintiff's back and in violation of the California Rules of Professional Conduct.

24.     Mr. Post and his attorney both demanded that the Martini parties keep the settlement discussions "secret" from Plaintiff.  Mr. Post and his attorney further advised the Martini parties that they were "lucky" at trial, that they faced a "long and expensive appeal" which they would lose and, thereafter, they would face a further re-trial of the underlying matter, all at further and great expense. The Martini parties believed these false and self-serving assertions by Mr. Post and his attorney and acted in reliance thereon.

25.     Specifically, Amber Hotel, by and through Mr. Post and his counsel, agreed to dismiss its appeal in exchange for the Martini parties executing a satisfaction of judgment.  Mr. Post and his attorney specifically told the Martini parties—and, again, the Martini parties relied on these representations—that, by agreeing to this settlement, all that the Martini parties were giving up was any potential malicious prosecution claim they may have against Amber Hotel.  The Martini parties did not understand that they were, in any manner, bargaining away the attorney's fees awarded by the trial court and, in effect, owned by Plaintiff as a result of his written attorney's lien on these monies.  The Martini parties understood and agreed that this award of attorney's fees belonged to Plaintiff and Plaintiff alone as a result of Plaintiff's attorney's lien on that final judgment.  The Martini parties asked and were specifically told by Mr. Post and his attorney that the settlement agreement being proposed would in no way impact the separate award of attorney's fees which they had assigned to Plaintiff.  In fact, in order to get the Martini parties to agree to the settlement, Mr. Post assured the Martini parties that everything would be fine and that he intended to pay Plaintiff the attorney's fees awarded in full.

26.     The settlement between Amber Hotel and the Martini parties was never documented—although Frank Martini repeatedly asked for such an agreement.  Mr. Post told the Martini parties that he was not comfortable creating a written agreement, because he wanted to be able to deny the existence of the settlement if it ever became necessary for him to do so. Specifically, Mr. Post said that he had a general "fear of J.J. Little" suing him if Mr. Little found out what he had done.  Based on these representations, the Martini parties, in fact, settled with

5
**COMPLAINT**

Amber Hotel by executing satisfactions of judgment in exchange for Amber Hotel dismissing its appeal.  In addition, Mr. Post personally gave Mr. Martini a "secret" $100,000 cash payment, which he told Mr. Martini to deny the existence thereof if he were ever asked about it.  Mr. Post again cited "fear of J.J. Little" suing him as the reason for this request.

27. Pursuant to the terms of the secret agreement reached between Amber Hotel and the Martini parties, Mr. Post agreed to pay the Martini parties—behind Plaintiff's back and without Plaintiff's knowledge—$100,000 in exchange for the Martini parties' agreement to sign satisfactions of judgment by which, as noted above, they thought they were only giving up any potential malicious prosecution claim against Amber Hotel; they did not understand this document to, in any manner, affect Plaintiff's entitlement to the attorney's fee award (although the release of Plaintiff's fee award is precisely what both Mr. Post and his attorney claimed the satisfactions of judgment accomplished, contrary to what they told the Martini parties).

28. On the night of March 24, 2008, Mr. Martini was told by Mr. Post to drive to Malibu to meet Mr. Post in the middle of the night, at a time when there would be no other "witnesses."  When Mr. Martini arrived at Mr. Post's offices, all the lights were off and Mr. Martini was directed to enter the premises from the rear of the building.  Upon doing so, he found Mr. Post sitting in a darkened room lit by a solitary light.  Mr. Post handed Mr. Martini several bundles of hundred dollar bills, totaling $100,000.  Mr. Post told Mr. Martini that he could never mention this payment to Plaintiff, because—if he did—he was certain that Plaintiff would sue him.  Further, Mr. Post told Mr. Martini that if he were ever confronted about whether he had made such a payment, he would deny it.  True to his word, when sued by Plaintiff for having interfered with his client relationship with the Martini parties and asked whether he had made this payment, Post repeatedly denied the same, despite the fact that he was testifying under oath, subject to the penalty of perjury.  Significantly, at the conclusion of the trial, in addition to ruling in Plaintiff's favor, the jury made a specific finding that Mr. Post had, in fact, made this "secret" behind-Plaintiff's-back payment to Mr. Martini, with Mr. Post's repeated protestations to the contrary notwithstanding.  In short, the jury concluded that Mr. Post had lied.

29. Mr. Post's attorney, who also acted as the attorney for Amber Hotel, prepared acknowledgments of satisfaction of judgment for the Martini parties to execute. At no time during this process was Plaintiff ever made aware of these negotiations and/or the terms of the purported settlement. Instead, Mr. Post and his attorney engaged in multiple active efforts to keep Plaintiff in the dark as to the existence and substance of these settlement discussions and to create plausible deniability in the event they were ever discovered.

30. Once the satisfactions of judgment were executed by the Martini parties, Mr. Post's attorney caused them to be filed with the court. Further evidence of Mr. Post's duplicity and that of his attorney is illustrated by the fact that, even though Plaintiff remained the Martini parties' counsel of record with respect to both the underlying trial matter and the pending appeal, neither Mr. Post nor his attorney bothered to serve Plaintiff with a copy of these satisfactions of judgment, as they were required by law to do. Instead, Plaintiff learned of these documents and the fact that there was some sort of settlement between Amber Hotel and Plaintiff's clients, only because the court sent the satisfactions of judgment to Plaintiff directly once it determined from the proofs of service filed therewith that Plaintiff had never received copies thereof.

31. Once informed of the settlement agreement, Plaintiff immediately wrote Amber Hotel's attorney, questioned the validity of the satisfactions of judgment and objected to all other attempts by Mr. Post to avoid paying Plaintiff the attorney's fee award that he was owed. In response, Amber Hotel's attorney denied that Plaintiff was owed any money because the settlement was a "joint walkaway" for "no money at all" and that Plaintiff's "so-called attorney lien" applied only to "such sums as were actually paid"—total rubbish.

**Little v. Amber Hotel Corporation**

32. In May 2009, Plaintiff filed suit against Amber Hotel and its attorney alleging a myriad of claims, including fraud, interference with contract, constructive trust and conversion. In addition to compensatory and punitive damages, Plaintiff also sought special damages—in the form of lost profits—stemming from Plaintiff's loss of the Martini parties as a longstanding client as a direct result of Amber Hotel's conduct as herein before stated.

33. After a lengthy jury trial, on June 29, 2010, the jury returned unanimous verdicts in Plaintiff's favor and against Amber Hotel on virtually every single one of Plaintiff's claims. Specifically, the jury found, *inter alia*, that Amber Hotel had induced the Martini parties to breach their contract with Plaintiff and interfered with the Martini parties' contract with Plaintiff, and awarded Plaintiff $190,684.06 in general damages and $692,307.68 in special damages.

34. Thereafter, on July 16, 2010, the Court issued a formal "Notice of Entry of Judgment" against Amber Hotel in the total amount of $882,991.74 plus ten-percent (10%) interest per annum. To date, Plaintiff's judgment against Amber Hotel exceeds $1.1 million.

35. On August 11, 2010, Plaintiff filed an Abstract of Judgment with the County Recorder's Office and, on September 23, 2010, filed a UCC filing statement with the California Secretary of State, thereby establishing himself to be a secured creditor of Amber Hotel.

### Amber Hotel's Scheme to Hide Assets

36. Immediately following entry of judgment in favor of Plaintiff in the Little v. Amber Hotel matter, Amber Hotel and Stephen Post, initiated a comprehensive scheme to divert assets belonging to Amber Hotel to Mr. Post for the purpose of rendering Amber Hotel insolvent and rendering Plaintiff's judgment uncollectible.

37. On July 17, 2010, only one day after Plaintiff's judgment was formally entered, Amber Hotel (acting by and through Mr. Post, its sole shareholder, President, Secretary and Treasurer) purported to negotiate and agree with himself, as an individual, a so-called "secured creditor agreement." Pursuant to this document, Mr. Post, *inter alia*, caused Amber Hotel to agree and stipulate that he, Stephen Post, had allegedly loaned Amber Hotel $291,347.55. No contemporaneous agreement existed at the time the monies were purportedly loaned, indicating that the funds, if indeed any were deposited to Amber Hotel, were anything other than an equity contribution. Rather, for the first time on July 17, 2010, Amber Hotel re-characterized any such transactions as an after-the-fact "line of credit" in the amount of $300,000 and Amber Hotel (acting by and through Mr. Post) agreed to accept the same and grant Mr. Post, retroactively, a security interest in all of Amber Hotel's present and future assets.

Case 1:14-ap-01113-MB    Doc 1    Filed 06/24/14    Entered 06/24/14 17:58:23    Desc
Main Document     Page 9 of 15

38. On information and belief, Plaintiff alleges that Mr. Post never made the cash transfers allegedly made under the "line of credit" and that any deposits actually made were immediately or soon thereafter offset with comparable transfers back to Mr. Post. These transactions, if any existed, were mere bookkeeping gimmicks to create debt to Mr. Post.

39. On information and belief, Plaintiff alleges that any deposits in fact made by Mr. Post to Amber Hotel were shareholder contributions of equity to a thinly capitalized, closely held corporation and not any form of a loan.

40. By reason of the fraudulent post hoc "agreement" between Mr. Post as an individual and Mr. Post as Chief Executive Officer of Amber Hotel, Mr. Post, in his individual capacity, transformed fraudulent bookkeeping transactions and shareholder contributions into "secured" debt of Amber Hotel, all on the very next day following an entry of judgment award against Amber Hotel in favor of Plaintiff.

41. Plaintiff is informed and believes, and on that basis alleges, that Amber Hotel deliberately overpaid interest allegedly due to Mr. Post on the purported loans with the result that Amber Hotel gratuitously transferred its assets to Stephen Post under the guise of interest payments. Plaintiff is further informed and believes that the sole purpose of these overpayments was to draw down the assets of Amber Hotel in order to frustrate Plaintiff's efforts to collect his judgment against Amber Hotel.

42. On or about September 20, 2010, two months after Plaintiff secured his judgment against Amber Hotel, Mr. Post incorporated a new entity, Post Financial Management Corporation (hereinafter, "PFMC").

43. Plaintiff is informed and believes, and on that basis alleges, that the sole corporate function of PFMC is to siphon receivership income out of the Amber Hotel business and frustrate collection of Plaintiff's judgment against Amber Hotel.

44. Amber Hotel continues to advertise receivership services as part of its core interrelated services.

45. After the incorporation of PFMC, Mr. Post caused all income earned from the receivership of hotel properties to be deposited into the newly created, separate bank accounts of

9
**COMPLAINT**

PFMC. Concurrent with this financial scheme, the income of Amber Hotel declined by an amount roughly equivalent to the value of the diverted receivership income stream.

46. On information and belief, at the same time that PFMC diverted income derived from receivership activities to its separate accounts, Amber Hotel bore the costs of the receivership business activity including telephone, office space and other administrative overhead.

47. On information and belief, at the same time that PFMC diverted income derived from receivership activities to its separate accounts, PFMC paid excessive receivership "commissions" directly to Mr. Post that served the primary purpose of diverting corporate income to Mr. Post.

48. As a result of Amber Hotel's scheme to siphon assets to Mr. Post and his wholly controlled corporate shell PFMC, Amber Hotel has been, for some time thinly capitalized—if capitalized at all. Nonetheless, in the twelve months before Amber Hotel's bankruptcy filing, Amber Hotel paid out in excess of $800,000 to Mr. Post, which payments include, *inter alia*, interest on purported lines of credit, commissions, and payment of multiple personal expenses. This extraordinary amount of money notwithstanding, Amber Hotel claims that it owes Mr. Post yet another $360,000 for six years of unpaid wages—which he claims is owed to him pursuant to a "verbal agreement" between him (Stephen Post) and Amber Hotel's CEO "Mr. Post."

**Amber Hotel's Bankruptcy Filing and Fraud on the Court**

49. On March 17, 2013, Amber Hotel filed for Chapter 11 bankruptcy protection in a matter entitled In re Amber Hotel Corporation (U.S.B.R., Central District, San Fernando Valley Div., SV 1:13-11804 AA).

50. In support of its bankruptcy petition, the Debtor knowingly and willfully defrauded the court about the nature of its assets and its purported debt to Stephen Post.

51. In the months and years between Plaintiff's judgment award against Amber Hotel and its petition for bankruptcy, Amber Hotel made excessive and surreptitious insider payments to Mr. Post and his family for, *inter alia*, purported loans, automobile payments, continuing education, medical insurance, parking, travel and even a three-thousand dollars ($3,000) per month recurring fee for "Legal."

10

**COMPLAINT**

52.     For example, the Debtor listed a $291,347.55 insider loan from Stephen Post in its Petition Schedule D as a "secured loan" in the amount of $122,000.00, and unsecured in the amount of $169,347.55.  Yet in the same Disclosure Statement, the debtor proposed to pay its insider 100% of the $291,347.55, listing that debt as fully secured while listing Mr. Little's secured judgment award as "unsecured."

53.     Amber Hotel's further defrauded the Court by disguising compensation to its insiders as general corporate expense.

54.     For example, Amber Hotel's compensation records reveal  large legal and professional fees paid during the period starting on October 1, 2008, through September 30, 2012, totaling $387,809 (per the tax returns filed) for which no 1099 forms were prepared, creating a deliberately false impression that these payments were genuine corporate expenses rather than lavish distributions to corporate insiders.

55.     Similarly Amber Hotel paid Mr. Post $550,308.21 during the period October 7, 2009, through July 17, 2010; however, these monies appear to have been spread through Amber Hotel's tax return in various different categories to disguise these payments to Mr. Post, and, once again, no 1099 forms exist to support these payments.

56.     Furthermore, Amber Hotel improperly charged $369,480.88 of secret payments to Stephen Post against revenue of the corporation to hide income, with $102,308.10 listed in tax returns as credit card interest expense and the remainder spread across other expense categories, in an effort to manipulate Amber Hotel's books to increase shareholder liability.  Amber Hotel's total income on its 2010 tax return was understated by $369,480.88, in an apparent effort to hide payment of this amount to Mr. Post.

57.     Amber Hotel further manipulated its books to disguise personal travel, automobile, meals and entertainment expenses incurred by Mr. Post as corporate expenses.

58.     Furthermore, only two months after Plaintiff obtained his judgment award against Amber Hotel, Mr. Post formed a new company and, while charging the expenses of that company's business to Amber Hotel and advertising the new company's services in connection with Amber Hotel,  pocketed the profits of this new company for himself.  The gross revenues for this new

entity were $980,000 through September 30, 2012, just months prior to Amber Hotel filing its Chapter 11 Petition.

59.     Each of these transactions was undertaken with the deliberate intent of hiding income of Amber Hotel and transferring assets of Amber Hotel to its corporate insider in advance of bankruptcy.  Amber Hotel knowingly and deliberately filed a disclosure statement in support of bankruptcy that took these fraudulent bookkeeping transactions as fact.  As a result of these fraudulent transactions and Amber Hotel's fraud on the Court, Amber Hotel's disclosure statement and subsequent filings understated the assets and income of the debtor and overstated the liability of the debtor with the deliberate intent and ultimate effect of deceiving creditors and the Court with respect to Amber Hotel's eligibility for reorganization under the Bankruptcy Code and the extent of its liabilities to corporate insiders.

60.     Amber Hotel carried forward its fraud on the court through examination, discovery and motions practice in the bankruptcy proceeding so that the extent and nature of this fraud could not be discovered until after the confirmation of the bankruptcy.

61.     Plaintiff sought discovery of Amber Hotel during the bankruptcy proceeding and submitted document subpoenas requesting, *inter alia*, the book and accounts of the Debtor.  Amber Hotel's responses deliberately concealed financial records that would have revealed the extent of its fraud on the Court and created a false assurance that all relevant records had been produced.  In addition, Plaintiff conducted the deposition of Amber Hotel's President, Chief Executive Officer, and sole Shareholder (with his wife), Stephen Post, requesting, pursuant to an attached request for documents, *inter alia*, Amber Hotel's financial records.  Once again, Amber Hotel failed to produce the overwhelming majority of these records, and Mr. Post, when questioned about Amber Hotel's finances and his financial dealings with Amber Hotel, gave answers which were deliberately evasive and/or otherwise nonresponsive.  Once again also, Amber Hotel provided false assurances to the Court, contrary to the foregoing, that both it and Mr. Post, individually, had cooperated fully and completely with Plaintiff's financial inquiries.

62.     However, after confirmation, the Bankruptcy Court appointed an examiner to review the books and files of the debtor.  Even in response to the requests of the examiner, Amber Hotel

produced three overlapping and inconsistent sets of financial accounts, failed to produce documentation substantiating its purported debt to corporate insiders and failed entirely to support its payments to corporate insiders as legitimate expenses of the corporation.

63. Despite the Debtor's obfuscation in response to the information requests from the Examiner, the new information produced to the Examiner and incorporated into his report reveals for the first time documentation of Amber Hotel's fraud on the Court and its creditors through its fraudulent disclosure statement and subsequent bankruptcy filings.

## COUNT 1

## **REVOCATION OF CONFIRMATION ORDER**

## **PURSUANT TO 11 U.S.C. §§ 1144 AND 1144(2)**

64. Paragraphs 1 through 63 of this Complaint are incorporated by reference into this paragraph in their entirety.

65. Had the Debtor and Mr. Post made full, candid and complete disclosure of its insider transfers to Stephen Post and misdirection of income to Mr. Post and his wholly controlled corporation Post Financial Management Corporation, Debtor's plan of reorganization would not have satisfied the requirements of the Bankruptcy code.

66. Debtor's plan of reorganization included provisions that purported to release direct claims of creditors and reclassify Plaintiff's secured debt as unsecured.   Neither creditors of the Debtor nor the Bankruptcy Court would have supported or approved the plan of reorganization had the Debtor fully disclosed the extent of corporate assets and income hidden or transferred to corporate insiders through sham transactions.

67. Debtor's plan of reorganization retained an equity interest for Mr. Post in the reorganized Debtor based on "substantial value" he contributed to the reorganized Debtor by voluntarily subordinating his "secured" claims against Amber Hotel and contributing $50,000 of cash to the Debtor.  Neither creditors of the Debtor nor the Bankruptcy Court would have supported or approved the plan of reorganization had the Debtor disclosed that the debt he voluntarily "subordinated" was fraudulent or that Mr. Post had siphoned off substantial assets of the Debtor in an effort to render the Debtor insolvent.

68. Debtor and Mr. Post had personal knowledge and were in possession of material information related to Debtor's financial condition and assets that would have influenced the Court's consideration and determination of the plan's merits under 11 U.S.C. §§ 524(e) and 129(a)(1) had they been timely disclosed.

69. Judged from an objective standard, Plaintiff contends that Amber Hotel's knowledge of its fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC were material to the Court's consideration of whether the plan of reorganization was valid and formed part of the body of reasonably adequate information under 11 U.S.C. § 1125(a) that creditors would want to know in order to make an informed judgment about the merits of Debtor's plan of reorganization.

70. Debtor and Mr. Post acted with actual fraudulent intent in concealing Debtor's fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC.

**11 U.S.C. § 1129(a)(2) and Debtor's Materially Defective Disclosure Statement**

71. By failing to make full, candid and complete disclosure of Debtor's fraudulent transactions with Stephen Post and his wholly controlled corporate entity, PFMC, Debtor's disclosure statement was materially defective.

72. At a minimum, the Creditors and the Court need to be made aware of these fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC as part of Debtor's duty to provide adequate information under 11U.S.C. § 1125(a) in order for such claim holders to make an informed judgment regarding whether to vote for or against the plan.

73. Debtor made these material misrepresentations by omission with actual fraudulent intent because Debtor and its principal Stephen Post had knowledge of the Debtor's fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC and were under an affirmative legal duty to disclose such transactions, which they failed to do.

74. Therefore, had the Court had the benefit of this information at the time of the confirmation hearing, Plaintiff respectfully submits that Debtor would not have been able to carry its burden of establishing that Debtor, as plan proponent, satisfied the requirements of 11 U.S.C. § 1129(a)(2).

**11 U.S.C. §§ 1129(a)(3)**

75.    The Debtor's failure to disclose its fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC, also constitutes a material misrepresentation by omission in connection with Debtor's burden of establishing that Debtor's plan was proposed in good faith as required by 11 U.S.C. § 1129(a)(3).

76.    Plaintiff contends that the Court would not have been able to make a finding of good faith under 11 U.S.C. § 1129(a)(3) had the Debtor made a full, candid and complete disclosure.

77.    The Debtor acted with fraudulent intent because it knew of Debtor's fraudulent transactions with Stephen Post and his wholly controlled corporate entity PFMC, was under an affirmative duty to disclose such transactions and failed to do so.

78.    The Court entered the Confirmation Order and found that Debtor's plan satisfied the requirements of 11 U.S.C. § 1129(a) due to the material affirmative misrepresentations and material misrepresentations by omission on the part of the Debtor.

79.    But for these misrepresentations, Debtor's plan would not have been confirmed. Therefore, Plaintiff respectfully requests entry of an order and judgment revoking the Confirmation Order, pursuant to 11 U.S.C. § 1144.

**WHEREFORE**, the Plaintiff respectfully requests that the Court enter an order and judgment revoking the Confirmation Order pursuant to 11 U.S.C. § 1144 and for such other and further relief as the Court deems to be justified under the circumstances.

Respectfully submitted,

Dated: June 24, 2014        J.J. LITTLE & ASSOCIATES

By: _____
James J. Little
Attorney for Plaintiff and secured Creditor
James J. Little